UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                              )
                                    )
James Edward Whitley,               )     Case No. 10-10426C-7G
                                    )
            Debtor.                 )
                                    )
_____)
                                    )
Charles M. Ivey, III, Trustee       )
for Estate of James Edward          )
Whitley,                            )
                                    )
            Plaintiff,              )
                                    )     Adversary No. 11-2025
vs.                                 )
                                    )
Robert Connolly,                    )
                                    )
            Defendant.              )
                                    )

<u>MEMORANDUM OPINION</u>

This adversary proceeding came before the court on March 5, 2013, for hearing on Defendant's Motion for Partial Summary Judgment. Christine L. Myatt and Brian Anderson appeared on behalf of the Defendant and Edwin R. Gatton appeared on behalf of the Plaintiff.

MATTER BEFORE THE COURT

The Plaintiff seeks in this proceeding to avoid and recover from the Defendant certain payments that the Defendant received from the Debtor on the theory that such payments were fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.1, <u>et</u> <u>seq.</u> The Defendant asserts that the payments were received by the Defendant for value and in good faith

and that the Defendant therefor is entitled to retain the funds
pursuant to section 548(c) of the Bankruptcy Code and N.C. Gen.
Stat. § 39-23.8(a).   In the motion for summary judgment, the
Defendant asserts that there is no genuine issue of material fact
regarding whether he received the payments for value and in good
faith and that summary judgment should be entered in his favor
pursuant to Rule 56 of the Federal Rules of Civil Procedure and
Rule 7056 of the Federal Rules of Bankruptcy Procedure.

I.   Nature of the Plaintiff's Claims

The Plaintiff's claims rely upon the presumption of fraud that
arises when a Ponzi scheme has been perpetrated.[1]   According to the
Plaintiff's allegations, during the period when the transactions
involving the Debtor and the Defendant occurred, the Debtor
presented himself to the public as owning and operating a factoring
business involving invoice funding and receivables financing.   The
Debtor engaged in promotions, including a website and direct
solicitation, to promote the appearance that he was engaged in the

---

[1] See, e.g., In re Grafton Partners, 321 B.R. 527, 532 (B.A.P.
9th Cir. 2005); Hayes v. Palm Seedlings Partners-A (In re Agric.
Research & Tech. Grp., Inc.), 916 F.2d 528, 536 (9th Cir. 1990);
Emerson v. Maples (In re Mark Benskin Co., Inc.), 1995 WL 381741,
at *5 (6th Cir. 1995); Christian Bros. High Sch. Endowment v. Bayou
No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 305
(S.D.N.Y. 2010), In re Bernard L. Madoff Inv. Secs. LLC, 445 B.R.
206, 220-21 (Bankr. S.D.N.Y. 2011); In re Taneja, 453 B.R. 618, 621
(Bankr. E.D. Va. 2011); Liebersohn v. Campus Crusade for Christ,
Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 110 (Bankr. D. Pa.
2002); Jobin v. Ripley  (In re M & L Bus. Mach. Co., Inc.), 198
B.R. 800, 806-07 (D. Colo. 1996).

factoring business.   The Debtor enticed various individuals, including the Defendant, to loan him funds which the Debtor represented would be used in his alleged factoring business.   The Debtor did so by offering high rates of return for investors. Through such representations, the Debtor enticed individuals to provide funds to the Debtor.   While he was soliciting such investments, the Debtor actually was conducting little or no business activities, but continued to represent that he was doing so to his investors.   To the extent that the Debtor made payments to investors as income or repayments of principal, such payments were funded from additional funds that the Debtor had obtained from other investors, and not from any income or profits generated from genuine business operations.   The Debtor's scheme collapsed in March of 2010 when an involuntary bankruptcy case was commenced against him.   Based upon the Debtor's involvement in a Ponzi scheme when he transferred the payments at issue to the Defendant, the Plaintiff maintains that there is a presumption that such payments were made by the Debtor with actual intent to defraud, and the payments may therefore be recovered under 11 U.S.C. § 548(a)(1)(A) and  N.C. Gen. Stat. § 39-23.1.

II.  The Defendant's Motion for Summary Judgment

The Defendant's motion does not challenge the Plaintiff's allegation that the Debtor was engaged in a Ponzi scheme.   Nor does the motion challenge the Plaintiff's contention that the payments

to the Defendant were made in the course of the Debtor's Ponzi
scheme such that there is a presumption that the payments were made
by the Debtor with fraudulent intent.   The Defendant asserts,
instead, that even if the payments were made by the Debtor with
fraudulent intent, the Defendant nonetheless is entitled to retain
the payments under section 548(c).   Thus, for the purpose of
deciding the Defendant's motion for summary judgment, the
allegation that the Debtor was engaged in a Ponzi scheme will be
accepted and it will be presumed that the payments that the
Defendant received were made by the Debtor with actual intent to
defraud.  This means that the only issues for consideration at this
time are those which arise under section 548(c).

III. Analysis of Good Faith Requirement under Section 548(c)

Under section 548(c), a transferee "that takes for value and
in good faith has a lien on or may retain any interest
transferred . . . to the extent that such transferee . . . gave
value to the debtor in exchange for such transfer. . . ." Section
548(c) functions as an affirmative defense in a fraudulent
conveyance proceeding with the result that the defendant/transferee
has the burden of proving both the value and the good faith
elements of section 548(c).  E.g. Breeden v. L.I. Bridge Fund, LLC
(In re Bennett Funding Grp., Inc.), 232 B.R. 565, 573 (Bankr.
N.D.N.Y. 1999)("[Section 548(c)] has been construed as an
affirmative defense, all elements of which must be proven by the

- 4 -

defendant-transferee."). To meet this burden, the evidence relied upon by the Defendant must be sufficient to satisfy the legal requirements of "value" and "good faith," as those terms are utilized in section 548(c).

The Defendant's argument that good faith should be determined according to a subjective standard under which good faith may be satisfied by a showing that a transferee did not have actual knowledge of any fraud on the part of the Debtor is not accepted. Instead, for the reasons that follow, the court concludes that good faith in this proceeding should be determined according to an objective standard under which good faith is dependent upon whether the circumstances known to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and whether a diligent inquiry would have discovered the fraudulent purpose.

As many courts and commentators have noted, the Bankruptcy Code does not provide a definition of "good faith." While most courts have not attempted to provide a precise definition of the phrase, courts have formulated various principles and criteria for use in determining whether a transfer was received in good faith for purposes of section 548(c). See In re Telesphere Commc'ns, Inc., 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994)("the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law"). While the principles and criteria that have been adopted

- 5 -

vary from case to case, they do agree that good faith should be determined on a case-by-case basis and depends upon the particular circumstances of each case.  E.g., Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995)("Good faith is not susceptible of precise definition and is determined on a case-by-case basis.").

In deciding upon the principles or criteria that the court should apply in this proceeding, the court begins with the case of Goldman v. Capital City Mort. Corp. (In re Nieves), 648 F.3d 232 (4th Cir. 2011), the most recent and perhaps most extensive discussion of good faith by the Fourth Circuit Court of Appeals. Although the good faith issue in Nieves arose under section 550(b)(1)[2], the court is satisfied that what is said in Nieves regarding "good faith" should apply equally to "good faith" as used in section 548(c), given that the identical term is used in both sections and in both sections such term is used in the context of determining whether a transferee will be allowed to retain an avoidable transfer.  In Nieves, the court held that "good faith, as used in section 550(b)(1), should be determined under an objective standard."    Consistent with this holding, good faith in a proceeding involving section 548(c), likewise should be determined

_____

[2]Under section 550(b)(1), a trustee may not recover an avoided transfer from an immediate or mediate transferee "that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided . . .."

under an objective standard.

In applying the objective standard, the court in Nieves affirmed the decision of the bankruptcy court that utilized a two-step approach to determining whether a transferee received a transfer in good faith. This approach involved first determining whether the defendant was placed on inquiry notice by the facts known to the transferee and, secondly, upon finding that such facts were present, then determining whether a reasonable inquiry would have disclosed the voidability of the transfer at issue. Regarding the first component, the court held that "the bankruptcy court applied the correct legal standard of objective good faith and we affirm as not clearly erroneous its factual finding that the facts known to CCM would have lead 'a lender under the circumstances of this case [to] inquire as to the record.'" Nieves, 648 F.3d at 241. Regarding the second component, the court stated that "[h]ad CCM conducted a reasonable search it would have discovered a number of facts pointing toward the voidability of the transfers." Id. at 242.

The court made clear in Nieves that under section 550(b)(1), whether an inquiry regarding a transfer is required depends upon the facts that were actually known by the transferee when the transfer was received and that a reasonable inquiry is the standard when a transferee is on inquiry notice. This court concludes that the same is true in determining good faith under section 548(c).

Accordingly, consistent with <u>Nieves</u>, if (1) the circumstances known to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and (2) a diligent inquiry would have discovered the fraudulent purpose, then there is a lack of good faith on the part of the transferee.  <u>In</u> <u>accord</u>, <u>Jobin</u>, 84 F.3d at 1338; <u>In re Bayou Grp., LLC</u>, 439 B.R. 284, 313-14 (S.D.N.Y. 2010)(collecting cases).  Under this standard, an objective, reasonable person standard applies to both the inquiry notice and the diligent investigation components of the good faith test. <u>Jobin</u>, 84 F.3d at 1334-35 (expressly rejecting a subjective standard under which a transferee would not lack good faith unless he had actual knowledge of the fraudulent nature of the transfer); <u>Bayou</u>, 439 B.R. at 313.  In this proceeding, application of the objective standard means that the first component of the above-described test will be governed by the facts that were actually known by the Defendant when the payments were received from the Debtor, and whether such circumstances would have placed a reasonable person on notice that the payments might be fraudulent. If a reasonable person would have been on notice, the relevant question then becomes whether an inquiry, if made with reasonable diligence, would have led to the discovery of the fraudulent nature of the payments.  <u>Id.</u> at 316; <u>Wiand v. Waxenberg</u>, 611 F.Supp.2d 1299, 1319-20 (M.D. Fla. 2009).

IV.    Summary Judgment Standard in This Proceeding

Where, as in this proceeding, the moving party has the burden of proof at trial, the standard for granting summary judgment is more stringent. Nat'l State Bank v. Fed. Reserve Bank, 979 F.2d 1579, 1582 (3rd Cir. 1992). See also Ray Comm. v. Clear Channel Commc'n, Inc., 673 F.3d 294, 299 (4th Cir. 2012)("Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense."). Where the movant has the burden of proof, the summary judgment standard mirrors the standard applicable when a trial court is ruling on a motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. See 9 James Wm. Moore et al., Moore's Federal Practice ¶ 50.06[6][b] (3d ed. 2012)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)(motion for summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)")). The standard in this proceeding, therefore, is the same as the standard for determining whether a judgment may be directed under Rule 50 in favor of a party with the burden of proof. As the Fourth Circuit explained in Sales v. Grant, 155 F.3d 768, 775 (4th Cir. 1998), under the applicable standard the non-moving party "must be given the benefit of every reasonable inference that could be drawn from the evidence, neither weighing the evidence nor assessing its credibility" and the motion

can be granted "only if, by [such] assessment, the only conclusion a reasonable jury could draw from the evidence" is in favor of moving party.  The motion must be denied if "reasonable minds could differ as to the conclusion to be drawn from the evidence."  Id.; See 9 Moore et al., ¶ 50.05[2] n.6 ("granting judgment for party with burden of proof possible only when evidence favoring movant is overwhelming").  The Defendant has failed to satisfy this stringent standard.

The Defendant had known the Debtor for several years before he began investing with him.  For several years the Defendant and the Debtor were neighbors living within approximately two blocks of each other.  On various occasions the Defendant attended football games with the Debtor, played golf with him, went on skiing trips with him, attended social events in the Debtor's home in Greensboro and visited the Debtor at his vacation home on Baldhead Island.  According to the Defendant, he began investing money with the Debtor in the 1990s and continued to do so until the latter part of 2008, and was owed an indebtedness of $1,600,000 as of March of 2010.  According to the Defendant, the loans were solicited by the Debtor and extended by the Defendant with the understanding that the funds would be used in the Debtor's factoring business.

The only information that the Defendant had regarding the Debtor's business was that the Debtor had told the Defendant that he was in the factoring business and later had introduced the

Defendant to a business associate who confirmed that he and the Debtor were in the factoring business. Despite the increasing magnitude of the loans made by the Defendant, the Defendant says that he did not ask for any additional information regarding the Debtor's business before he made the first loan or at any time while he was making the additional loans and did not receive any additional information, although "near the end" the Debtor had provided the Defendant with a list of alleged clients that proved to be false.

The Defendant was aware that a factoring business required the factor to have funds with which to conduct business and that such a business ordinarily would have a relationship with a bank or other commercial lender in order to obtain such funding. Even though the Defendant became aware that the Debtor was obtaining loans from other individuals, the Defendant never inquired about whether the Debtor had a banking relationship and never asked the Debtor why he was resorting to loans from individuals in order to fund his business.

Although the Defendant filed a proof of claim in which he claimed he was owed $1,600,000 when the chapter 7 case was filed on March 8, 2010, he was not able to supply any information regarding when the indebtedness was incurred or how much of the $1,600,000 consisted of interest and how much consisted of principal. The only document attached to the proof of claim is a one-page document

that states only "I owe Bob Connolly $1,600,000 payable on or before December 31, 2010.  This note replaces and supercedes any all previous notes" and is signed by the Debtor.  According to a notarization on the document it was signed by the Debtor on March 1, 2010, which was only a week before the chapter 7 case was filed against the Debtor.  This also was several months after it had become widely known among investors who had loaned money to the Debtor, including the Defendant, that the Debtor had been engaged in a fraudulent scheme.

Although the Defendant had an accounting background from college and his past employment, according to his testimony, he never maintained any type of ledger sheet or other record of the amounts he had loaned or the amounts that had been repaid by the Debtor.  According to the Defendant, he had the various promissory notes received from the Debtor and used them to keep up with the amounts he had loaned, the amounts that had been repaid and the balances that remained unpaid.  However, other than the note attached to his proof of claim, the Defendant has been able to produce only eight documents that purport to be promissory notes from the Debtor.  The earliest of these documents is a one-page document containing the words "Promissory Note" at the top and stating only "I owe Bob Connolly $300,000, payable on before Jan. 1,2003" and signed by the Debtor and dated December 6, 2001.

The next document is not designated as a promissory note and

instead lists several dates followed by dollar amounts, with the Debtor's signature at the bottom of the page.  The first entry is "October, 2006" followed by:

"$1,185,000
Payment @ $23,700"

According to the Defendant, this indicated that in October 2006, he was owed $1,185,000 and that the Debtor's monthly payment was $23,700.  The second entry is "November, 2006" followed by:

"$300,000
Payment $30,000"

According to the Defendant, this entry was for a different loan that had a monthly payment of $30,000.  The third entry is "December, 2006" followed by:

"$1,485,000
Payment @ $29,700"

According to the Defendant, this entry indicated that he was owed $1,485.000 in December of 2006 and that the Debtor's monthly payment at that time was $29,700.  The Defendant was unable to say whether the $1,485,000 in December included the $300,000 figure shown for November nor provide any information as to whether the figures on this document included any interest, stating "I could not tell you if I had to whether that was strictly principal, strictly interest, or a combination. . . ."  The last entry on this document is "May, 2007" followed by:

"150,000
Payment $30,000"

According to the Defendant he has no recollection of and can provide no information whatsoever regarding this entry.

The remaining six documents produced by the Defendant each consist of one-page documents designated at the top of the page as promissory notes and signed by the Debtor. In ascending order, the first of these documents was signed on December 6, 2007 and states "I owe Bob Connolly $50,000, payable on or before February 23, 2008." The next document is dated May 13, 2008, and states "I owe Bob Connolly $90,000, payable on or before, 2008." The next document also is dated May 13, 2008, and states "I owe Bob Connolly $1,500,000, payable on or before June 1, 2008." The next document also was signed on May 13, 2008, and states "I owe Bob Connolly $91,000, payable on or before, June 13, 2008." The next document is dated December 17, 2008, and states "I owe Bob Connolly $242,000, payable on or before March 31, 2009." The last of these documents is dated January 20, 2009, and states "I owe Bob Connolly $1,500,000 payable on or before January 1, 2011. This note supercedes and replaces any and all previous notes." At his deposition the Defendant testified that he had no recollection—"absolutely zero" recollection as the Defendant expressed it—regarding any of the transactions giving rise to these promissory notes and was unable to say whether the amounts referred to in the notes included interest or was entirely principal. The Defendant also professed to have no recollection regarding the

nature of the payments that he received from the Debtor.

The only payments that the Defendant admits receiving are payments that have been documented by the Plaintiff and are described in the Plaintiff's complaint. These payments consist of twenty payments that the Defendant received from the Debtor between May 24, 2006, and November 26, 2008. These payments ranged in amount from $20,000 to $95,000 and total $877,400. The Defendant says he can recall no other payments. Also, according to the Defendant, he has no recollection regarding the circumstances under which the payments to him were made and could not say whether they were intended as interest payments or principal payments.

While the Defendant testified that the interest rates on the his loans to the Debtor was between one percent to two percent per month, no promissory note or other document reflecting such an interest rate has been produced. The Defendant knew little about the factoring business or the type of returns that the Debtor would be able to obtain in his alleged factoring business. Moreover, the Defendant was aware of the returns that he was receiving on most of his other investments and bank accounts and knew that an annual percentage rate of twenty-four percent was significantly greater than he was able to obtain except for one or two investments that he was unable to identify.

When he made the loans to the Debtor, the Defendant had investments such as equities and mutual funds, and had a financial

adviser that he consulted regarding his investments. Although the amounts of the loans he made to the Debtor apparently were very substantial, the Defendant says he did not make any type of investigation or conduct any type of due diligence regarding the Debtor or the business the Debtor had described before he began making loans to the Debtor. Nor did the Defendant seek any advice from his financial advisor regarding the loans to the Debtor. Based on his experience from his other investments, the Defendant also was aware that he received regular statements and reports regarding such investments and realized no such reports or statements, written or otherwise, were being provided by the Debtor. Even so, the Defendant says that he never sought to obtain information from the Debtor regarding his business, such as whether the existence or location of a business office, the number of employees, a list of customers, or the particular factoring deals for which the loans were sought.

Although the Defendant had been told that the Debtor had a factoring business and that the loans were for use in the business, the checks written by the Defendant to fund the loans were made payable to the Debtor personally and not to a business even after the Defendant had become aware of South Wynd Financial. Also, the checks that the Defendant received from the Debtor were drawn on the Debtor's personal account and not a business account.

Although the Defendant was familiar with commercial promissory

notes and was aware that such documents were formal legal documents
that contained extensive terms, the documentation he received from
the Debtor was much different, and consisted of documents prepared
by the Debtor on a single sheet of paper.  These documents were
scarcely more than IOUs, in some cases were handwritten and
included little more than the amount of the loan, a date, and the
Debtor's signature.

The Defendant's loans to the Debtor were not extended as a
favor to a friend.  The loans were business transactions which were
prompted by a profit motive, i.e., the interest the Debtor was
willing to pay the Defendant in order to obtain the loans.  The
Defendant made these loans with little knowledge regarding the
Debtor's alleged business and with virtually no due diligence.  By
any measure, the loans were at the high end of the risk scale.  One
inference that could be drawn is that the interest rate that was
required in order to induce the Defendant to take the substantial
risk associated with making large loans to the Debtor was of a
magnitude that should have prompted inquiry regarding the Debtor.

When these circumstances and the reasonable inferences that
follow are examined under the standard articulated in Sales v.
Grant, the court does not find that the only conclusion that a jury
could draw in this case would be in favor of the Defendant.  The
situation, instead, is one in which reasonable minds could differ
as to whether the facts and circumstances known to the Defendant

would have placed a reasonable person on inquiry notice regarding the Debtor's fraudulent purpose and as to whether a reasonable inquiry would have disclosed the Debtor's fraud. The Defendant, therefore, is not entitled to summary judgment with respect to the good faith issue.

V.   Analysis of the Value Requirement under Section 548(c)

A good faith transferee can prevent the avoidance of a challenged transfer under section 548(a)(1)(A) and N.C. Gen. Stat. § 39-23.1 by demonstrating that he took the transfer in exchange for value.   "Value" is defined both in the Bankruptcy Code and under the North Carolina Fraudulent Transfer Act to include a transfer in exchange for the satisfaction of an antecedent debt. N.C.Gen.Stat. § 39-23.3(a); 11 U.S.C. § 548(d)(2)(A).   In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to a debtor in exchange for payments that in the aggregate do not exceed the principal amount of the investment, but not as to any payments in excess of principal. Perkins v. Haines, 661 F.3d 623, 627 (11th Cir.2011); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Scholes v. Lehmann, 56 F.3d 750, 757-58 (7th Cir. 1995). Under a concept referred to as the "netting rule" most courts determine the liability of an investor in a Ponzi scheme by comparing the amount of a defendant's principal investment with the aggregate amount received in return on the investment. See Donnell, 533 F.3d at 770. An investor who receives a positive

- 18 -

return on investment is liable under the fraudulent conveyance
statute for any amount received in excess of the investor's
principal investment, regardless of whether the investor received
the payments in good faith, because payments in excess of principal
are not made for value. Id. Where payments received by a
defendant in good faith do not exceed a defendant's principal
investment however, these payments are supported by value and a
defendant is entitled to retain the amounts under 11 U.S.C.
§ 548(c). See In re Lake States Commods., Inc., 253 B.R. 866, 872
(Bankr. N.D. Ill. 2000) (collecting cases).

The Defendant testified that he began investing with the
Debtor in approximately 1991, but the Defendant's records go back
only to February 11, 2004. From February 11, 2004 until
December 18, 2008, the Defendant says that he invested a total of
$1,068,800 with the Debtor and received $877,400 in payments from
the Debtor. However, the Defendant supplied no information as to
the amount of the payments he received from the Debtor prior to
February of 2004. Under these circumstances, the court concludes
that there is a material issue of fact regarding whether and to
what extent the Defendant "gave value" under section 548(c). The
court cannot determine whether the Defendant is a net winner or
loser because the total amount transferred by the Debtor to the
Defendant, and the amount loaned by the Defendant to the Debtor, is
not a fact included in the record before the court. Although a

court may not require a defendant/transferee to disgorge profits received outside the applicable statute of limitations, the court must nevertheless net the total amount transferred by the debtor to the defendant/transferee against the amounts invested by the defendant/transferee in order to assess the defendant's liability. See Donell v. Kowell, 533 F.3d at 771 (court must first determine whether a defendant is liable based on all transfers received, and then determine the extent of the defendant's liability in light of factors such as the statute of limitations and good faith). This lack of evidence distinguishes the Defendant's case from the Grubb and Cole cases. In those cases, the evidence encompassed the entirety of their dealings with the Debtor and was sufficient to permit the court to compute whether value was given by netting those figures. By contrast, in this case the court is presented with a request for summary judgment in which there is thirteen years of missing information regarding the payments received from the Debtor by the Defendant. The Defendant, therefore, is not entitled to summary judgment with respect to the value requirement under section 548(c).

VI. Conclusion

Based upon the foregoing, the court concludes that the Defendant's motion for summary judgment should be denied both as to whether the transfers from the Debtor were received in good faith and as to whether the Defendant gave value for the payments

received from the Debtor.  An order so providing shall be entered
contemporaneously with the filing of this memorandum opinion.

This 1st day of May, 2013.

William L. Stocks
WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST


Edwin R. Gatton, Esq.
P.O. Box 3324
Greensboro, NC 27402

Christine L. Myatt, Esq.
Brian Anderson, Esq.
P.O. Box 3463
Greensboro, NC 27408